## COMMONWEALTH vs. FELIX PICHARDO.

No. 96-P-1784.

Essex. January 13, 1998. - August 13, 1998.

Present: WARNER, C.J., BROWN, & JACOBS, JJ.

*Homicide. Malice. Practice, Criminal,* Instructions to jury, Jury and jurors. *Self-Defense. Witness,* Credibility. *Jury and Jurors.*

In the circumstances of a murder case, the judge's erroneous definition of third prong malice (using the term "grievous bodily harm") confused the distinction between murder and involuntary manslaughter; where the evidence could support a conviction of either murder or manslaughter, a substantial risk of a miscarriage of justice was created and a new trial was required. [299-301]

The evidence at a murder trial did not warrant an instruction on voluntary manslaughter on a theory that the defendant used excessive force in defense of another. [301-302]

At the retrial of a murder case, the judge's definition of malice should be in accordance with the holding of ·*Commonwealth* v. *Eagles,* 419 Mass. 825, 836 (1995). [302]

At a murder trial the judge's instructions to the jury on unanimity of the verdict were adequate. [302]

At the retrial of a murder case, the prosecutor should not improperly vouch for the credibility of Commonwealth witnesses. [302-303]

At the retrial of a murder case in which the defendant is Hispanic and the victim white, the trial judge should exercise his discretion to assess whether possible ethnic bias necessitates questioning of the venire in whole or individually on that issue. [303]

INDICTMENT found and returned in the Superior Court Department on December 29, 1993.

The case was tried before *Wendie I. Gershengorn,* J.

*Susan J. Baronoff* for the defendant.

*Robert J. Bender,* Assistant District Attorney (*David W. Duncan,* Assistant District Attorney, with him) for the Commonwealth.

WARNER, C.J. A Superior Court jury found the defendant guilty

of second degree murder. Because of the trial judge's erroneous instruction regarding the third method of proving malice, the jury may have found malice on a lower level of proof than required by law.[1] Therefore, the conviction must be reversed and a new trial held.

The jury could have found the following facts beyond a reasonable doubt. At around midnight on July 21, 1993, the defendant, Jason Nault, Ramon Romero, Rudolpho Casado, and others were involved in a fight with Dennis Dietrich, the victim, during which Dietrich used the epithet, "Spic." In the melee, Dietrich stabbed Casado in the arm with a knife or screwdriver, and Romero and the defendant hit Dietrich with a crowbar. A friend brought Casado to the hospital where he was given seven stitches.

Casado then returned to a housing project known as "the Hancock Projects" where he, the defendant, Romero, Nault, Marc Carignan, and Franklin Perez shared between four and six "Philly blunts" — cigars emptied of tobacco and refilled with marihuana. At some point, Nault and the defendant left. Casado, Romero, and another friend got into a car and went looking for them, believing that they had gone off to smoke without sharing.

Casado spotted them at Dietrich's house, Nault on the porch and the defendant at the bottom of the porch near the gate. A shot rang out, and Romero quickly drove back to the Hancock Projects. Moments later, the defendant returned to the project, and referring to Nault, said, "This guy's crazy. This guy just shot at the house."[2]

About ten minutes later, Romero left to drive Casado and another friend, Paul Manion, home. The defendant went along. Some time during the night, Nault had given the defendant a

---

[1] "Malice as an element of murder may be proved by evidence establishing any one of three facts beyond a reasonable doubt: if, without justification or excuse, (1) the defendant intended to kill the victim (the so-called first prong of malice), or (2) the defendant intended to do the victim grievous bodily harm (the second prong), or (3) in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (the third prong). *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987)." *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992).

[2] Another witness testified that he saw Nault shoot at Dietrich's house. Nault denied that he had done the shooting.

handgun which the defendant put under the front passenger seat of the car.[3] After Manion was dropped off, the defendant got into the front passenger seat, while Casado remained in the back.

As they drove along Bodwell Street, the defendant told Romero to stop the car. Dietrich and Marc Carignan were walking toward one another. Dietrich, who was ten or fifteen feet away from Carignan, had his hands in the air. Carignan was uncertain whether Dietrich intended to speak to him or to attack him. Romero pulled the car up and began to get out. As the car stopped, Dietrich began to walk away from Carignan and "walk[] around . . . working his way up to the right [passenger] side of the car." Romero saw nothing in Dietrich's hands. Something shadowy emerged from the passenger side window of the car, and a click and two shots sounded. The defendant then reached his arm back into the car, holding a handgun, and said, "I think I hit him," or, "I think I got him."

Immediately after the shooting, Casado, Romero, Carignan, Nault and the defendant returned to Romero's apartment at the housing project. The defendant and Nault argued, and Romero heard the defendant say to Nault, "What the fuck; I thought the gun was empty." The defendant looked surprised and frightened.

At the time Dietrich was shot, approximately 3 A.M. on January 22, a Lawrence police officer was at Dietrich's home investigating a report that gunshots had been fired at the house. He heard two or three shots outside and, walking in the direction of the sounds, found Dietrich lying on the bloodied sidewalk approximately two hundred yards away. He had been shot in the back and subsequently died of the gunshot wound.

The officer learned from witnesses that Dietrich had fought with Nault and others earlier that night. The police apprehended Nault in his apartment and also apprehended the defendant, who was attempting to flee.[4] Based on information obtained from Nault, the police found the gun used to shoot Dietrich, a .380

---

[3]The exact time Nault gave the defendant the gun is not clear. Nault testified that the time was 9:30 P.M. Paul Manion testified that he saw Nault showing the defendant a gun much later, well after midnight. Casado testified that he saw Nault and the defendant having a conversation just before the defendant got into the car to take Casado and Manion home, but he did not see anything pass between them.

[4]The defendant was indicted on December 29, 1993. Rudolpho Casado and Ramon Romero were also charged with murder, but charges against Casado

semiautomatic pistol, in a nearby schoolyard. A spent cartridge found in front of Dietrich's house came from the same gun.[5]

*The third prong malice instruction.* The defendant did not object to the instruction. He argues on appeal, and we agree, that the trial judge's erroneous definition of third prong malice "obscured the distinction between second degree murder and involuntary manslaughter." Because the evidence in this case could support either a conviction of murder based on third prong malice or a conviction of involuntary manslaughter, the instruction created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Vizcarrondo,* 427 Mass. 392, 392 & n.1, 395 (1998).

The trial judge instructed the jury that the third prong of malice could be satisfied "if, in the circumstances known to the defendant, a reasonable, prudent person would have known that, according to common experience, there was a plain and strong likelihood that death *or grievous bodily harm* would follow the contemplated act" (emphasis supplied). Nothing "less than a plain and strong likelihood of death [is] sufficient for proof of the third prong of malice." *Commonwealth* v. *Vizcarrondo,* 427 Mass. at 395-396, quoting from *Commonwealth* v. *Sires,* 413 Mass. 292, 303 n.14 (1992). See *Commonwealth* v. *DiRenzo,* 44 Mass. App. Ct. 95, 99-100 (1997).

"The difference between the elements of the third prong of malice and wanton and reckless conduct amounting to involuntary manslaughter lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew. The risk for the purposes of the third prong of malice is that there was a plain and strong likelihood of death. . . . The risk that will satisfy the standard for wilful and wanton conduct amounting to involuntary manslaughter 'involves a high degree of likelihood that substantial harm will result to another.' *Commonwealth* v. *Welansky,* 316 Mass. 383, 399 (1944)." *Commonwealth* v. *Sires,* 413 Mass. at 303-304 n.14.[6]

As in *Commonwealth* v. *Vizcarrondo,* 427 Mass. at 396-398,

were dropped, and those against Romero reduced, in exchange for their testimony against the defendant.

[5]Another spent cartridge, found inside Dietrich's house, was too damaged for identification.

[6]The trial judge instructed on involuntary manslaughter based on wanton and reckless conduct. See *Commonwealth* v. *Sires,* 413 Mass. at 303-304 n.14. She described the risk of harm required as "a high degree of likelihood that

the question here is whether "the instructions permitted the jurors to infer malice solely from conduct that 'involves a high degree of likelihood that substantial harm will result to another.' [*Commonwealth* v.] *Sires*, [413 Mass.] at 303-304 n.14. Such an inference is insufficient to support a conviction for murder based on the third prong of malice. See *id*."

Taking one view of the evidence, reasonable jurors could have inferred that the defendant acted with malice — that he knew or should have known that his act created a plain and strong likelihood of death. They could properly have made this inference if they believed that the defendant knew he was shooting a loaded gun at Dietrich from a distance of ten to fifteen feet. However, viewing the facts differently, the jury could have concluded that the defendant did not act with malice. They could have given some credence to his assertion, made during an argument with Nault shortly after the shooting, that he thought the gun had been empty. Nault had given the defendant the gun within hours of the shooting, and it is possible that he told the defendant that it was unloaded.[7]

Even if the jurors believed that the defendant may have thought the gun was empty when he shot Dietrich, they could have found that he acted with "such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct" amounting to involuntary manslaughter. *Commonwealth* v. *McCauley*, 355 Mass. 554, 560 (1969), quoting from *Commonwealth* v. *Welansky*, 316 Mass. at 399. There was no evidence that he had done anything to ensure that the gun was unloaded before he shot at Dietrich. A prudent person in the defendant's circumstances would have realized that the gun

---

substantial harm will result," "the risk of doing great bodily harm by choice," and "[a course that] a prudent person would recognize . . . would probably lead to serious bodily injury to another person."

The Supreme Judicial Court has noted that "serious" and "grievous" are synonymous in many contexts. *Commonwealth* v. *Reed*, 427 Mass. 100, 105 (1998). In *Commonwealth* v. *DiRenzo*, 44 Mass. App. Ct. at 100, we equated "serious bodily injury" with "grievous bodily harm" for purposes of our decision regarding an erroneous third prong malice instruction.

[7]It is true that the defendant must have fired the gun at least once knowing that it was loaded, since a click and two gunshots sounded when he shot Dietrich. By the time he fired the second gunshot, the defendant could not have believed that Nault had given him an empty gun. It is possible, however, that the defendant fired the first shot at Dietrich not knowing the gun was loaded. There is no evidence which shot hit Dietrich.

might be loaded, and that his act was highly likely to cause substantial harm. See *id.* at 561 (the defendant could have been convicted of murder or of manslaughter in a shooting death, depending upon the jury's view of his state of mind).

This latter version of the events supported a verdict of manslaughter, but no more. However, the jurors may have convicted the defendant of murder based on these facts because of the erroneously lowered standard given for proving the third prong of malice. See *Commonwealth* v. *Vizcarrondo,* 427 Mass. at 395-397; *Commonwealth* v. *DiRenzo,* 44 Mass. App. Ct. at 100-101 & n.8 (in both cases, murder convictions were reversed because erroneous third prong malice instructions may have caused the jury to convict of murder rather than involuntary manslaughter). See also *Commonwealth* v. *Sneed,* 413 Mass. 387, 389-393 (1992) (a second degree murder conviction was reversed because an erroneous second prong malice instruction confused the distinction between murder and involuntary manslaughter). Compare *Commonwealth* v. *Fordham,* 417 Mass. 10, 21-22 (1994); *Commonwealth* v. *Van Liew,* 38 Mass. App. Ct. 934, 935 (1995) (in both cases, there was no substantial risk that the jury convicted the defendants of murder rather than manslaughter based on erroneous malice instructions).

We now turn to other issues that may arise upon retrial.

1. *Voluntary manslaughter.* The defendant's contention that the judge should have given a voluntary manslaughter instruction, on the theory that the defendant may have used excessive force in defense of Carignan, was without merit. His trial strategy was to suggest that (1) the Commonwealth had not proven that he fired the fatal shot, and (2) he did not know the gun was loaded. An instruction concerning defense of another would have been at odds with these theories. "Counsel may not try a case on one theory of law, and then obtain appellate review on another theory which was not advanced at trial." *Commonwealth* v. *Lazarovich,* 410 Mass. 466, 476 (1991).

In any event, the evidence did not warrant such an instruction. A defendant is entitled to an instruction relating to the law of self-defense only if there is "evidence warranting at least a reasonable doubt that the defendant: (1) had a reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to

the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case. Absent the latter two elements, an instruction on manslaughter because of reasonable provocation or because of the use of excessive force in self-defense may be warranted." *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980) (citations omitted). The elements of defense of another parallel the elements of self-defense. *Commonwealth* v. *McClendon*, 39 Mass. App. Ct. 122, 126 (1995), and cases cited.

It is true that Dietrich fought with the defendant and his friends several hours before the shooting and may have had a weapon at that time. However, when Dietrich approached Carignan later that night, his hands were in the air and no weapon was visible. His intentions were unclear to Carignan. Importantly, Dietrich had begun to walk away from Carignan just before he was shot. At that point, Carignan was not in imminent danger. Under these circumstances, the judge was not required to charge the jury on the use of excessive force in defense of another. See *Commonwealth* v. *A Juvenile (No. 1)*, 396 Mass. 108, 114 (1985); *Commonwealth* v. *Weichel*, 403 Mass. 103, 108 (1988); *Commonwealth* v. *Paton*, 31 Mass. App. Ct. 460, 464-465 (1991) (all finding insufficient evidence to require an instruction concerning the law of self-defense). Compare *Commonwealth* v. *Epsom*, 422 Mass. 1002, 1003 (1996) (evidence that the defendant was backing away from a group of men coming toward him supported his claim of self-defense).

2. *"Frame of mind" language.* The trial judge's definition of malice included the statement that "malice aforethought refers to a frame of mind which includes not only anger, hatred, and revenge, but also every other unlawful and unjustifiable motive." This "frame of mind" language was subsequently disapproved in *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995), and should, of course, be omitted at retrial.

3. *Unanimity.* The defendant contends that the trial judge did not adequately instruct the jury that they must agree unanimously on the degree of homicide. The general unanimity instructions conveyed to the jury that they must agree unanimously on the verdict, including the degree of homicide. See *Commonwealth* v. *Sylvester*, 400 Mass. 334, 340 (1987). There was no error.

4. *Vouching for the credibility of witnesses.* We trust that the prosecutor will not repeat the improper remark, made in his

opening statement, that certain of his witnesses eventually "came forward and then said the truth of what happened." See *Commonwealth* v. *Trigones*, 397 Mass. 633, 642 (1986).

5. *Questioning of jurors.* The defendant is Hispanic and the victim was white. The defendant contends on appeal that the prospective jurors should have been questioned about possible ethnic bias, although at trial defense counsel made no such request and, in fact, asked the judge *not* to conduct individual voir dire. It will be for the judge at retrial to assess "whether the case . . . is likely to generate extraneous influences . . . such as racial bias," in determining whether to grant a request, if made, to question jurors about possible ethnic bias. *Commonwealth* v. *Ramos*, 31 Mass. App. Ct. 362, 363-364 (1991), and cases cited. See *Commonwealth* v. *De La Cruz*, 405 Mass. 269, 273-274 (1989) (Hispanic persons are not viewed as a race for purposes of jury empanelment).

*Judgment reversed.*

*Verdict set aside.*