## Commonwealth *vs.* Paul E. Solomonsen.

No. 97-P-1415.

Bristol. April 12, 2000. - September 26, 2000.

Present: Kass, Jacobs, & Rapoza, JJ.

*Homicide. Malice. Practice, Criminal,* Capital case, Instructions to jury, Assistance of counsel, New trial. *Witness,* Limits on testimony.

At a murder trial, there was no substantial risk of a miscarriage of justice arising from the judge's erroneous instruction to the jury on the third prong of malice, where the judge also gave the instruction correctly, and where the evidence of the defendant shooting the victim twice at close range could not give rise to any inference other than a plain and strong likelihood that death would follow from the defendant's actions. [124-125]

At the trial of a murder indictment, the judge did not err in allowing a witness to state the meaning of what the defendant had said as he threatened another with a gun, in circumstances in which the witness could not recall the defendant's exact words. [125-126]

At a murder trial, defense counsel was not demonstrated to be ineffective by reason of his handling of evidence that persons present at the scene of the murder were armed with baseball bats. [126-127]

A criminal defendant's motion for a new trial was properly denied where the judge found that the proffered evidence in support was not newly discovered and that the witness who testified thereon was not credible. [127]

Indictment found and returned in the Superior Court Department on May 25, 1994.

The case was tried before *Herbert F. Travers, Jr.,* J., and a motion for new trial, filed on September 10, 1998, was heard by *Raymond J. Brassard,* J.

*Geoffrey C. Packard,* Committee for Public Counsel Services, for the defendant.

*Catherine B. Sullivan Ledwidge,* Assistant District Attorney, for the Commonwealth.

Kass, J. There was no dispute that the defendant, Paul E. Solomonsen, shot and killed the victim. The main issues at trial

were whether the defendant committed murder or acted in self-defense, or, if the killing was unlawful, whether he was guilty only of manslaughter. The defendant appeals his conviction of second degree murder,[1] arguing that the jury instructions on malice were incorrect and that a witness was erroneously permitted to testify as to his subjective impression of what someone said. He also claims that trial counsel was ineffective in not exploiting certain evidence to the fullest and that his motion for a new trial based on newly discovered evidence should have been allowed. We affirm.

1. *Facts.* On April 28, 1994, the defendant awoke at about 11:00 A.M. and consumed some beer, some cocaine, and a prescription medication. Dinner later that day was followed by more cocaine, beer, rum, and — for entertainment — "scratch" lottery tickets. As the evening wore on, the defendant and a friend, Jose Buitrago, headed to the Shark Club, located on Coggeshall Street in New Bedford's North End, and, once there, consumed more beer. They soon ran out of money and left in search of additional funds. The pair returned a short while later, armed with financial means and three handguns.

As closing time approached (it was now the small hours of the 29th), patrons of the Shark Club began to leave, the defendant and Buitrago included. Outside, the defendant had words with Thomas Branquino (with whom he had tussled earlier in the evening), the bar manager, and some of the bouncers. He then produced and brandished a handgun, and invited Branquino to "fuck with [him] now." The situation was defused when Buitrago escorted the defendant across the street to where their car was parked.

After the defendant and Buitrago reached the car, however, Jeffrey Rosanina, not previously involved in conflict with the defendant, left the Shark Club and walked toward them. When Rosanina reached the car, the defendant was seated in the passenger seat and the passenger-side door was open. Rosanina walked up next to the seated Solomonsen, leaned his right elbow on the car's roof, and appeared to converse with the defendant. Others, including Rosanina's brother, set off after him, but before they reached the car, two shots rang out: one bullet struck Rosanina in the chest; the other, in the head.

---

[1]The defendant also was convicted of unlawful possession of a firearm, G. L. c. 269, § 10(*a*). Although his notice of appeal recites that he is also appealing from that conviction, he does not raise any issues pertaining to it in his brief.

Witnesses flagged down a State trooper patrolling Coggeshall Street, who quickly apprehended the defendant. The victim was rushed to the hospital, where he died several days later. At the scene, the defendant told the trooper that Rosanina had a knife and was going to kill him. The defendant said that he had been sitting in the car when a punch, delivered by an unseen assailant, landed on his mouth and he fell out of the car. There, the defendant saw a gun that he believed had dropped out of Rosanina's pants. Looking up, he saw Rosanina standing above him with a knife and shot twice. The defendant repeated this story later that morning at the police station. No knife was recovered from the scene.

At trial, the defendant presented a self-defense theory of the case consistent with the version of events he told the State troopers at the scene and during his subsequent interrogation. He admitted, however, that the gun used against Rosanina was part of the arsenal that he and Buitrago had assembled that evening. The defendant also testified that, just before he was punched in the mouth, he saw someone advancing on the car with a baseball bat. The jury convicted the defendant after seven days of evidence. The defendant appealed his convictions and then moved for a new trial based on newly discovered evidence and on the ineffectiveness of trial counsel. With the appeal from his convictions stayed, the motion for a new trial was denied. The defendant's appeal of that denial has been consolidated with the appeal of his convictions.

2. *Jury instruction on the inference of malice from the use of a dangerous weapon.* In addition to the indicted charge of first degree murder based on deliberate premeditation, the judge instructed the jury on second degree murder and voluntary and involuntary manslaughter. The defendant did not object to the jury instructions at trial. Indeed, the trial judge's first cut at the three prongs of malice in second degree murder was on the button and faithful to *Commonwealth* v. *Grey*, 399 Mass. 469, 470 & n.1 (1987). That is, malice is present if the defendant, without justification or excuse, (1) intended to kill the victim, or (2) intended to do the victim grievous bodily harm, or (3) in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act. *Ibid. Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 394-395 & n.3 (1998). As the judge

continued his instructions, however, he lapsed into a discarded description of third prong malice, namely, that malice could be inferred if the defendant used such force that, in common experience, death or grievous bodily harm would follow. Third prong malice requires nothing less than reasonable understanding that a plain and strong likelihood of death will follow; anticipation of grievous bodily harm does not cut it for second degree murder. *Commonwealth* v. *Sires*, 413 Mass. 292, 303 & n.14 (1992). *Commonwealth* v. *Fuller*, 421 Mass. 400, 412 (1995). *Commonwealth* v. *Vizcarrondo*, 427 Mass. at 395-396.

During their deliberations, the jurors asked the judge again to define malice. In reinstructing the jury, the judge again got it right the first time and, as he elaborated, slipped into the "death or grievous bodily harm" fallacy with regard to third prong malice.

There is no danger, however, that the erroneous instruction could have led the jury to infer third prong malice based upon the impermissibly lower standard of grievous bodily harm. The evidence showed that the defendant shot the victim twice as the victim stood next to him. "A reasonable jury could not fail to recognize that the defendant's brutal attack created a clear and plain likelihood of death." *Commonwealth* v. *Caines*, 41 Mass. App. Ct. 812, 817 (1996). "One who deliberately shoots another" multiple times at so close a range "knows, as matter of law, that there is a plain and strong likelihood of death." *Commonwealth* v. *Niland*, 45 Mass. App. Ct. 526, 532 n.4 (1998). There was no substantial risk of a miscarriage of justice.[2] *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

3. *Witness testimony as to the meaning of a statement.* The defendant contends that it was error for the judge to allow Joseph Machado, a witness to the pre-shooting incident outside the Shark Club, to testify as to the meaning of what the defendant said when he brandished the gun and yelled at Thomas Branquino. Machado first answered that the defendant said something *like,* "Come on," or, "I got this for you," but he could not recall the exact words. Defense counsel objected to the use of the word "like." The judge had difficulty explaining to Machado that, if he could not remember the exact words spoken, he could testify to the substance of what the defendant said. After two unsuccessful attempts, the judge, believing that

---

[2]Nor was trial counsel ineffective for failing to raise an objection.

Machado did not understand the meaning of the word "substance," instructed him, "[Y]ou can tell us what the meaning of what [the defendant] said was . . . if you don't remember the exact words." Machado then testified, "All right. The meaning was this, then: You come any closer. I'm going to fucking shoot you. That was the meaning." With no question before him, Machado continued, "If he would have come any closer . . . Tommy would have got shot right there and then." Defense counsel objected, but the judge permitted the testimony to stand.

"A witness rarely can recite an oral conversation verbatim. All that in reason he can be asked to do is to give the substance of the talks." *Commonwealth* v. *Bonomi*, 335 Mass. 327, 347 (1957). As Professor Wigmore states:

> "The general rule, universally accepted, is therefore that the substance or effect of the actual words spoken will suffice, the witness stating this substance as best he can from the impression left upon his memory. He may give his 'understanding' or 'impression' as to the net meaning of the words heard."

7 Wigmore, Evidence § 2097(a) (Chadbourn rev. ed. 1978). See *Kittredge* v. *Russell*, 114 Mass. 67, 68 (1873) (the witness may testify as to the substance of another's conversation if he cannot remember the exact words); *Hayes* v. *Pitts-Kimball Co.*, 183 Mass. 262, 263-264 (1903) (same). In this context, no significant distinction exists between asking the witness for the "substance" as opposed to the "meaning" of an oral statement that he or she cannot remember exactly. Either form of the question requires paraphrasing a statement that would be difficult to repeat verbatim because of the complexity of the utterance (certainly not the case here) or the passage of time since it was made. See *Middlebrook* v. *Texas*, 803 S.W.2d 355, 358-359 (Tex. App. 1990) (citing cases). The judge did not use the word "meaning" in the sense of interpretation. There was no error. Our opinion should not be read as an invitation to put questions or give answers that edge into interpretation. See Liacos, Massachusetts Evidence § 7.5, at 383 (7th ed. 1999).

4. *Ineffective assistance of counsel.* The defendant claims that trial counsel was ineffective in failing to exploit fully evidence that some of those milling about outside the Shark Club may have been armed with baseball bats at the time of the shooting.

The record reflects that defense counsel extensively questioned two State troopers, one civilian witness, and the defendant about the presence of baseball bats at the scene of the incident. Defense counsel also mentioned the presence of baseball bats numerous times in his closing statement. Defense counsel's handling of the baseball bat issue was reasonable and did not deprive the defendant of a defense. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

5. *Motion for a new trial.* The defendant claims error in the denial of his motion for a new trial based on newly discovered evidence, Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979). To succeed, the defendant needed to demonstrate that the evidence was newly discovered, and that it was credible, material, and cast real doubt on the justice of the conviction. *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986). *Commonwealth* v. *Markham*, 10 Mass. App. Ct. 651, 654 (1980). The defendant contends that the testimony of Julius Richardson met those criteria. According to his testimony at the hearing on the new trial motion, Richardson was present outside the Shark Club during the incident and saw Rosanina, leaning over the car in which the defendant was seated, "swat at" the defendant. He also saw two people walking toward the car with baseball bats just before the shots were fired.

The motion judge, who was not the trial judge, found that, as Richardson was incarcerated with the defendant while the defendant was awaiting trial in this case and had spoken with the defendant about the incident, the characterization of the evidence as "newly discovered" was highly suspect. This is correct. Newly discovered evidence is evidence that cannot have been reasonably discovered by the defendant or his counsel at the time of trial. *Commonwealth* v. *Grace, supra* at 306. Richardson's testimony was not of that character. The motion judge further found that Richardson (who had a list of prior convictions) lacked credibility. Cf. *Commonwealth* v. *Roberio*, 428 Mass. 278, 281 (1998). There was no "significant error of law or other abuse of discretion" in the denial of the defendant's motion for a new trial. *Commonwealth* v. *Grace*, 397 Mass. at 307.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*