## Commonwealth *vs.* Mark R. Russell.

Middlesex. January 7, 2003. - May 8, 2003.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Homicide. Malice. Practice, Criminal,* Instructions to jury.

At a hearing on a motion for a new trial in a murder case on the grounds that the trial judge had erroneously instructed the jury with respect to the third prong of malice by allowing them to find malice based on a plain and strong likelihood of mere grievous bodily harm as opposed to a likelihood of death, and that defense counsel's failure to object to the erroneous instruction constituted ineffective assistance, there was no substantial risk of a miscarriage of justice where, on the instructions given, the jury's verdict of guilty of murder in the second degree indicated that they had found intentional, not accidental, conduct in the manner that those concepts had been unambiguously presented and argued to them, i.e., that the defendant ran over the victim with a motor vehicle on purpose and not by accident (conduct posing nothing less than a plain and strong likelihood of death). [344-351]

Indictment found and returned in the Superior Court Department on May 1, 1992.

Following review by the Appeals Court, 38 Mass. App. Ct. 199 (1995), a motion for a new trial, filed on September 21, 1998, was heard by *Stephen E. Neel,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Thomas D. Ralph,* Assistant District Attorney, for the Commonwealth.

*Ruth Greenberg* for the defendant.

Sosman, J. The defendant was convicted of murder in the second degree, and his conviction was affirmed on direct appeal. *Commonwealth* v. *Russell,* 38 Mass. App. Ct. 199 (1995). Represented by new counsel, the defendant moved for a new trial on the ground that the judge had erroneously instructed the jury with respect to the third prong of malice, allowing them to

find malice based on a plain and strong likelihood of mere grievous bodily harm as opposed to a likelihood of death. See *Commonwealth* v. *Azar*, 435 Mass. 675, 682-684 (2002); *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 395-396 (1998), *S.C.*, 431 Mass. 360 (2000). He also contended that counsel's failure to object to the erroneous instruction constituted ineffective assistance of counsel. Acknowledging that the instruction was in error, the motion judge (who was also the trial judge) denied the motion on the ground that the error did not create a substantial risk of a miscarriage of justice. In an unpublished memorandum of decision and order pursuant to its rule 1:28, the Appeals Court reversed. *Commonwealth* v. *Russell*, 54 Mass. App. Ct. 1110 (2002). We granted the Commonwealth's application for further appellate review. We conclude that the error posed no substantial risk of a miscarriage of justice, and therefore affirm the order denying the defendant's motion for new trial.

1. *Facts.* The victim, a pedestrian, was killed when she was struck by a vehicle operated by the defendant. The Commonwealth presented evidence showing that the defendant had argued with the victim and struck her in the face a day or two prior to her death,[1] and that he had "kept looking at her" and "snarled" when he encountered her in a bar some twenty minutes prior to the fatal collision. The victim had left the bar visibly upset, and the defendant left a minute or two thereafter.

According to the Commonwealth's witnesses, the victim was walking on the sidewalk in front of a restaurant on Market Street in Lowell at approximately 1:30 A.M. She was plainly visible (wearing a white sweater and carrying a red and white striped umbrella). The defendant, operating a Pontiac Grand Prix, drove by at a high rate of speed, made a U-turn, went up on the sidewalk, and ran the victim over without attempting to

---

[1]The evidence suggested that the victim was an acquaintance of the defendant, and that he attempted to pick her up on the street one night. He was angered when she refused to accompany him for free. The defendant suggested to the victim that, because they were "friends," she should go with him without being paid, to which the victim responded that she was not standing out on the street at night "to make friends." An argument ensued, culminating in the defendant slapping the victim's face.

stop or slow down. The defendant drove off, leaving the victim lying face down, with her head two to three feet from the curb. An eyewitness to these events, who happened to be going by on a bicycle, reported the incident at a nearby police station, and, after leaving the station, encountered the defendant. The witness told the defendant that he had just hit someone, whereupon the defendant returned to the scene. Before the arrival of the police or medical personnel, the defendant put on latex gloves and moved the victim's body farther out into the street.[2] Expert witnesses opined that the victim had been struck with the right front fender of the defendant's vehicle, that the brakes had not been applied prior to impact, that the vehicle had been driven over the victim, and that the vehicle had been traveling up to twenty miles an hour at the time. Based on this evidence, the Commonwealth argued that the defendant had run over the victim on purpose.

The defendant presented evidence supporting the contrary theory: that the collision had occurred entirely by accident. The defendant claimed that the combination of alcohol and medication he had consumed earlier that night had impaired his faculties. He had been moving his car to a legal parking space, and had turned around near the restaurant. Visibility was poor, and his windshield was smeared. He had no recollection of seeing anyone or hitting anyone with his car, and was unaware of the incident until the man on the bicycle told him he had hit someone. The defendant claimed that, on returning to the scene, he did not recognize the victim (although he acknowledged that he had known her in the past and might have seen her earlier at the bar). He denied having moved the body, and ascribed put-

---

[2]The defendant arrived back at the scene before the eyewitness, and, when the eyewitness returned, he observed the defendant removing latex gloves and tossing them into the trunk of his vehicle. When police and medical personnel arrived, the body was farther out into the street than where the eyewitness to the accident had seen the body. From the victim's injuries, medical personnel expected to find blood underneath the body. There was a pool of blood near the curb, but little or no blood underneath the body in its location out in the street. From this evidence, the jury could infer that the defendant had deliberately moved the body farther out into the street to make the collision appear accidental.

ting on gloves to his training as a nursing assistant.[3] Two defense witnesses testified that they had seen the victim step off the sidewalk just prior to impact, one of them placing her "a few feet" from the sidewalk and the other placing her "in the middle of Market Street." The latter witness confirmed that the defendant had moved the body, but testified that the defendant had moved the body closer to the sidewalk, not further out into the street.[4] Based on this evidence, the defendant argued that the collision was entirely accidental, and that his degree of culpability was no greater than mere negligence.

2. *Instructions.* The judge's instructions on murder in the second degree began with the definition of the first element, "the unlawful killing." As part of that definition, the judge explained that an "accident" qualified as an "excusable" killing and therefore was not an "unlawful" killing. He instructed the jury that the evidence in the case raised the issue whether the killing was "excused as the result of an accident," and that they therefore needed to "determine whether the [d]efendant intentionally committed the act or whether what occurred was an accident." He then defined "accident" as "an unexpected happening that occurs without intention or design on the [d]efendant's part," "a sudden, unexpected event that takes place without the [d]efendant's intending it," repeating that "[i]f an act is accidental, it is not a crime." Reminding the jury of the burden of proof, the judge further explained that the defendant did not have to prove justification or excuse. "Rather, the Commonwealth must prove to you beyond a reasonable doubt that the killing was not the result of an accident. If it fails in its burden to prove that the killing was unlawful and not accidental, then you need not proceed further but must return a verdict of not guilty on the indictment for murder."

The judge then turned to the element of malice, defining malice by reference to the three prongs. As to the third prong, the judge erroneously instructed the jury that malice could be

---

[3] Although the defendant had no specific recollection of rendering medical aid to the victim, the suggestion was that he may have been preparing to do so.

[4] This testimony was contrary to the evidence concerning the location of blood. See note 2, *supra.*

inferred "if in the circumstances known to the [d]efendant, a reasonable prudent person would have known that according to common experience there was a plain and strong likelihood that death *or grievous bodily harm* would follow the contemplated act" (emphasis added). The inclusion of "grievous bodily harm" was in error, as only a plain and strong likelihood of death suffices to satisfy the third prong of malice. See *Commonwealth* v. *Azar*, 435 Mass. 675, 682-684 (2002); *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 395-396 (1998); *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992); *Commonwealth* v. *Sires*, 413 Mass. 292, 303 n.14 (1992); *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987). The judge also instructed the jury that malice could be inferred from the use of a dangerous weapon, but that that inference could not be drawn "if the use of a dangerous weapon was unintentional or accidental," reminding the jury that the burden was on the Commonwealth to prove that the use of any dangerous weapon "was not unintentional and not accidental."

After completing his instructions on murder in the second degree, the judge instructed the jury on the lesser included offense of manslaughter. He defined manslaughter as "an unlawful killing, unintentionally caused by an act which constitutes such a disregard of probable, harmful consequences to another, as to rise to the level of wanton or reckless conduct." To explain what was meant by "wanton or reckless conduct," the judge described escalating categories of "carelessness," from mere negligence, through gross negligence, and finally wanton or reckless conduct, requiring the Commonwealth to prove "that grave danger to others was apparent, and that the [d]efendant chose to run the risk rather than alter his conduct so as to avoid the act which caused the harm." He concluded with the explanation that "[t]he essence of wanton or reckless conduct is intentional conduct where such conduct will most likely result in substantial harm to another."

3. *Discussion.* The defendant made no objection to the erroneous third prong malice instruction,[5] and the error was not

---

[5]Defense counsel's request for instructions included the erroneous reference to "grievous bodily harm," and defense counsel repeatedly used that errone-

raised on direct appeal.[6] As such, the error was waived, and we review the defendant's motion for a new trial — whether based on the error itself or framed as a claim of ineffective assistance of counsel — solely to determine whether the error gives rise to a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Randolph*, 438 Mass. 290, 293-296 (2002); *Commonwealth* v. *Azar*, *supra* at 685-687. That test requires us to determine "if we have a serious doubt whether the result of the trial might have been different had the error not been made." *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999). Specifically, we consider four questions: (1) whether there was error, (2) whether the defendant was prejudiced by the error, (3) "[c]onsidering the error in the context of the entire trial," whether it would be "reasonable to conclude that the error materially influenced the verdict," and (4) whether we may infer from the record that counsel's failure to object was not a reasonable tactical decision. *Commonwealth* v. *Randolph*, *supra* at 298. We find a substantial risk of a miscarriage of justice and grant relief "[o]nly if the answer to all four questions is 'yes.' " *Id.*

Here, three of the questions are readily answered in the affirmative: there was an error, its nature was adverse to the defendant, and we perceive no tactical or strategic reason for defense counsel's failure to object (or for appellate counsel's failure to raise the issue on direct appeal). At issue is the third question, namely, whether it would be "reasonable to conclude that the error materially influenced the verdict." *Id.* That question must be analyzed "[c]onsidering the error in the context of the entire trial," *id.*, with reference to "the evidence and the case as a whole," *Commonwealth* v. *Azar*, *supra* at 687.

In numerous cases positing the identical error in the definition of third prong malice, we have concluded that the likeli-

---

ous formulation of third prong malice when discussing the requests during the charge conference. Ironically, the prosecutor brought to the attention of the judge and defense counsel the correct definition of third prong malice premised on a "plain and strong likelihood that death would follow the contemplated act," accurately citing both *Commonwealth* v. *Sneed*, 413 Mass. 387 (1992), and *Commonwealth* v. *Grey*, 399 Mass. 469 (1987), as his sources for that definition.

[6]Different counsel represented the defendant on his direct appeal.

hood of fatality posed by the defendant's conduct was such that the error posed no substantial risk of a miscarriage of justice. Where the conduct in question posed a risk of harm that was not less than a plain and strong likelihood of death, we have found this particular error nonprejudicial. See *Commonwealth v. Dahl*, 430 Mass. 813, 816, 826-827 (2000) (stab wound to torso and numerous blows to head); *Commonwealth v. Freeman*, 430 Mass. 111, 122-123 (1999) (repeated stab wounds to head, neck, and chest); *Commonwealth v. Murphy*, 426 Mass. 395, 397, 401 (1998) (stabbing to chest); *Commonwealth v. Fryar*, 425 Mass. 237, 248, cert. denied, 522 U.S. 1033 (1997) (same); *Commonwealth v. Mello*, 420 Mass. 375, 389-390 (1995) (setting fire to occupied apartment building in middle of night). See also *Commonwealth v. Solomonsen*, 50 Mass. App. Ct. 122, 125 (2000) (shooting at close range); *Commonwealth v. Niland*, 45 Mass. App. Ct. 526, 532 (1998) (same); *Commonwealth v. Caines*, 41 Mass. App. Ct. 812, 817 (1996) (prolonged and forceful strangulation).[7]

The Commonwealth contended, and the judge agreed, that the risk posed by deliberately driving over a pedestrian at a speed approaching twenty miles an hour creates nothing less than a plain and strong likelihood of death. We agree with that analysis. The reasonably prudent person knows that running down a pedestrian with a car poses a plain and strong likelihood that the pedestrian will die, not merely a likelihood of injury. According to common experience, such encounters between pedestrians and vehicles are likely to prove fatal. As such, the nature of this particular fatal attack is comparable to the fatal attacks in the above cases, and the erroneous definition of third prong malice is of no consequence.

The defendant argues, however, that his own version of the accident — a completely unintentional collision with the victim that occurred while he was under the influence of liquor and

[7]By comparison, if the nature of the blows or wounds inflicted could be seen as posing a likelihood of grievous bodily injury but not necessarily a likelihood of death, the reference to "grievous bodily injury" in third prong malice does create a substantial risk of a miscarriage of justice. See *Commonwealth v. Williams*, 428 Mass. 383, 384-385, 387-389 (1998) (repeated blows with fist); *Commonwealth v. Vizcarrondo*, 427 Mass. 392, 397-398 (1998), *S.C.*, 431 Mass. 360 (2000) (striking infant).

prescription medication — would potentially give rise to a verdict of manslaughter, and that the error in the third prong malice definition posed a substantial risk of a miscarriage of justice because it blurred the proper boundary between murder and manslaughter. The argument ignores the fact that the judge instructed the jury, pointedly and at length, that they could not return a verdict of murder unless the Commonwealth proved beyond a reasonable doubt that the killing was not an "accident." This instruction, given as part of the definition of "unlawful" killing, came prior to any instruction on malice, and the jury were told that they "need not proceed further but must return a verdict of not guilty on the indictment for murder" if the Commonwealth failed to prove that the killing was not an "accident." In other words, the jury would not even reach the issue of malice — let alone its third prong — unless they first found against the defendant on the fundamental premise of his manslaughter theory. Inherent in the jury's verdict in this case is a finding that the defendant ran the victim over intentionally, not accidentally. Once the collision has been found to be an intentional attack, the likely consequences of that form of attack are such that the erroneous third prong malice instruction does not raise a substantial risk of a miscarriage of justice.

Seeking to avoid the ramifications of the judge's instruction on accident, the defendant posits that the "intentional" conduct found by the jury to satisfy the Commonwealth's burden to prove nonaccidental conduct could have been the defendant's "intentional" driving of a car while impaired, not necessarily the "intentional" striking of the victim. Thus, while the jury may have believed that the collision was "accidental," they could have treated the defendant's decision to drive the vehicle as the culpable "intentional" conduct and, consistent with the judge's instructions, moved on to consider the element of malice. Because "intentionally" driving a car while impaired may pose only a plain and strong likelihood of grievous bodily harm, and not necessarily a likelihood of death, the defendant contends that the error in third prong malice could have caused the jury to return a murder verdict when they actually found only manslaughter.

While it would theoretically be possible for the jury to parse

the instructions and apply them to the evidence in the manner now suggested by the defendant, that theoretical possibility bears no relation to the way the case was tried. From the outset of the trial through the presentation of evidence and the closing arguments, the parties' respective positions were abundantly clear: the Commonwealth contended that the defendant had run the victim over on purpose, and the defendant contended that he had not seen the victim or even been aware that he had struck her. In his opening statement, defense counsel told the jury that the prosecutor would try to prove that the defendant "killed intentionally," whereas the evidence would show that the defendant only "killed another human being by accident." The prosecutor presented the evidence that would show that the striking itself was intentional — the vehicle going up over the curb despite the fact that the roadway provided ample space in which to complete a U-turn, the highly visible red and white stripes on the umbrella carried by the victim, the failure to apply the brakes even in the final moment prior to impact, the implausibility that the driver would not have known that he had driven over someone, the defendant's moving of the victim's body in order to try and conceal the purposeful nature of the collision, and the defendant's motive to strike the victim stemming from recent animosity between them (including an angry confrontation just minutes prior to the collision). The defendant presented evidence to show that the collision was unintended and purely accidental — his impaired state due to alcohol and medication, the poor visibility, the white wall of the building behind the victim (which would make the victim's white sweater blend in with the background, not stand out), and the victim's stepping off the curb to cross the street (suggesting that she was hit in the street, not on the sidewalk). The defendant testified that he did not "intentionally kill that woman," and that he did not even remember hitting her. He also denied any prior argument or altercation with the victim, and denied any confrontation occurring earlier that night. On cross-examination, the prosecutor confronted the defendant with the accusation that he "ran her over on purpose," and that he had done so "[b]ecause [he] wouldn't take no for an answer," to which the defendant responded, "No, that's not true."

Defense counsel's questions constantly referred to the incident itself as "the accident." The prosecutor and defense counsel tussled back and forth over the fact that the police expert who examined the scene and the medical examiner both used the term "accident" in their initial reports. Defense counsel pointed out that those witnesses had treated the incident as an "accident," and that the evidence suggesting otherwise had only surfaced much later from unreliable witnesses who were either seeking to curry favor with the prosecution or influenced by media reporting. The prosecutor sought to downplay the use of the term "accident" in those early reports, pointing out that the medical examiner had no way of knowing what was in the mind of the driver of the vehicle.

The closing arguments reflected these diametrically opposed views as to whether the defendant had struck the victim on purpose or by accident. The defense closing argued that "[e]verything was consistent with an accident," "what happened was an accident," the medical examiner had determined it was an "accident," the vehicle had struck "[a] glancing blow that in a terrible tragedy killed her," "this is an unintentional act," "a negligent act" that was not even manslaughter. Defense counsel characterized the prosecutor's position as alleging an intentional slaying (that the defendant "intentionally killed this unfortunate woman," "that he killed her on purpose," and that "he killed her over free sex"), with the defense arguing that the only evidence of such "an intentional act" surfaced months after the accident and that the prosecution had no persuasive evidence "of an intentional act." The prosecutor argued that the only reason the defendant's car went up over the curb onto the sidewalk was because the defendant "intentionally was trying to strike" the victim, that he "ran her down," and that he did not stop "[b]ecause he meant to do it" and "meant to hit her." The prosecutor pointed out that the Commonwealth did not have to prove any "motive" for the killing, but that the evidence established "why [the defendant] did it." He asked rhetorically how anyone could drive in the manner the defendant did "and not mean to hit her," arguing that if such a driver did not mean to hit the victim the driver would "stop," and the only reason

for the driver to leave such a scene "is because [he] meant to do it." Pointing to the forensic evidence confirming that there had been no application of the brakes and no attempt to stop, the prosecutor argued that the defendant never stopped "because he knew what he did" and that "everything that the [d]efendant did before, during, and after the death of [the victim] shows his intent."[8]

The judge's extensive instructions on accident and the Commonwealth's burden to prove that "the killing was not the result of an accident" were surely understood by the jury to refer to the kind of "accident" that had been so hotly contested throughout the trial, i.e., to whether the actual striking of the victim was "accidental" or "intentional." By the time of the judge's instructions, the term "accident" had been repeatedly used in only that context, and only fertile imagination would suggest that the jury invented the novel concept that some other aspect of the defendant's conduct might be "intentional" as opposed to "accidental." At no point had the Commonwealth suggested or even hinted that a murder verdict could be predicated on the defendant's having "intentionally" driven while impaired. Nor had the defendant's repeated contention that the case was one of "accident" remotely suggested the theory that he had only "accidentally" gotten behind the wheel of a car while impaired. While it may be theoretically possible to drive "by accident," we see no risk that the jury understood the judge's instruction on "accident" to refer to such a farfetched and hitherto unmentioned theory of "accident." On the instructions given, the jury's verdict meant that they had found intentional, not accidental, conduct in the manner that those concepts had been unambiguously presented and argued to them, i.e., that the defendant ran the victim over on purpose and not by accident. That conduct poses nothing less than a plain and

---

[8]Indeed, from the prosecutor's closing argument, it was clear that the Commonwealth was arguing first or second prong malice based on a theory of the defendant's actual "intent." The prosecutor's argument did not invoke third prong malice, let alone invoke any erroneous definition of third prong malice. Cf. *Commonwealth* v. *Azar*, 435 Mass. 675, 684 (2002) (prosecutor's closing invited jury to rely on erroneously defined third prong malice).

Commonwealth *v.* Russell.

strong likelihood of death and renders the erroneous malice instruction nonprejudicial.[9]

As the terminology implies, a "substantial risk of a miscarriage of justice" refers to a risk that has some genuine substance to it. That standard does not encompass an abstract, theoretical possibility of a miscarriage of justice, utterly divorced from the case as it was tried. When evaluating the potential impact of an error, we consider the error "in the context of the entire trial," *Commonwealth* v. *Randolph*, 438 Mass. 290, 298 (2002), and in light of "the evidence and the case as a whole," *Commonwealth* v. *Azar*, *supra* at 687. If an error in that "context" poses a substantial risk, we grant relief. If, however, the only risk identified is one that is totally removed from or at odds with that "context," we may rest assured that the error did not give rise to a substantial risk of a miscarriage of justice.

*Order denying motion for a new trial affirmed.*

---

[9]The defendant contends that an instruction on accident cannot cure an erroneous third prong malice instruction, citing *Commonwealth* v. *Pichardo*, 45 Mass. App. Ct. 296 (1998). The *Pichardo* opinion does not even reference an instruction on accident, nor does it discuss how the instruction might affect the analysis. More importantly, the *Pichardo* facts involved a defendant firing a gun at a time when he may have believed that it was unloaded. There was apparently no dispute that the pulling of the trigger was "intentional" and not "accidental" conduct. It would not be fanciful or farfetched to consider that the jury might have concluded that intentionally firing a weapon without confirming whether it was loaded was intentional conduct that posed a risk of grievous bodily injury. The Commonwealth apparently did not argue that the accident instruction combined with the parties' treatment of the concept of accident in that case eliminated the risk of a miscarriage of justice, and we express no opinion whether such an argument would have had merit if raised. As illustrated by our opinion today, analysis of such an argument requires consideration of both the content of the accident instruction and a detailed review of the manner in which the parties presented and argued their theories of "accidental" as opposed to "intentional" conduct.

The defendant's reliance on *Commonwealth* v. *Cherubin*, 55 Mass. App. Ct. 834 (2002), is also misplaced. While bearing some factual similarity to the present case (in the sense that it involved a vehicle colliding with a pedestrian), the opinion does not address or even reference the accident instruction.