COMMONWEALTH *vs.* DAVID PROULX.

No. 03-P-99.

Essex. December 8, 2003. - July 13, 2004.

Present: ARMSTRONG, C.J., BECK, & CYPHER, JJ.

*Homicide. Malice. Practice, Criminal,* Instructions to jury, Waiver.

This court concluded that where a defendant indicted for murder in the second
degree did not object at trial to the erroneous portion of a jury instruction
that permitted a finding of malice on evidence that the defendant commit-
ted an act creating a plain and strong likelihood of death or grievous
bodily harm, and did not raise the issue of the instruction's error until his
third motion for a new trial, the defendant waived his right to review of
the issue [460-461]; moreover, this court concluded that the error did not
give rise to a substantial risk of a miscarriage of justice, where the element
of malice was not in dispute at the trial and where the evidence was
overwhelming that the injury could only have been caused by an act creat-
ing a plain and strong likelihood of death [461-466].

INDICTMENTS found and returned in the Superior Court Depart-
ment on June 15, 1983.

The case was tried before *Walter E. Steele,* J., and a motion
for a new trial, filed on July 27, 1999, was heard by *Isaac Bo-
renstein,* J.

*Elin H. Graydon,* Assistant District Attorney, for the
Commonwealth.

*Richard J. Fallon* for the defendant.

CYPHER, J. In 1984, a jury convicted the defendant, David
Proulx, of murder in the second degree for the death of his
girlfriend's two year old daughter, Tanya Parker (Tanya).[1] In

---

[1]We affirmed the conviction on direct appeal, and further appellate review
was denied. See *Commonwealth* v. *Proulx,* 23 Mass. App. Ct. 985 (1987). The
denial of the defendant's first motion for new trial was affirmed on appeal,
and further appellate review was denied. See *Commonwealth* v. *Proulx,* 28
Mass. App. Ct. 1101 (1989). The denial of the defendant's second motion for

2002, a Superior Court judge allowed the defendant's third motion for new trial after concluding that an error in the jury instructions on the third prong of malice created a substantial risk of a miscarriage of justice. The Commonwealth appeals.

A. *Summary of the evidence.* At trial, the Commonwealth proceeded on the theory that the defendant, who had a history of hitting Tanya, inflicted the fatal injury. The Commonwealth presented testimony of three attending physicians; the medical examiner; an expert on battered child syndrome; Theresa Parker (Theresa), who was Tanya's mother; four friends of the defendant and Theresa, including a household helper who lived with them during the summer of 1982; and two Massachusetts State troopers.

The primary theory of the defense, developed through cross-examination and closing argument, was that Theresa had killed Tanya. A second theory of defense, which was not as thoroughly developed, was that Tanya accidentally injured herself by falling from her bed onto a toy box or by falling and hitting her head on a rocking chair. The defendant rested after the Commonwealth's case. The Commonwealth introduced the following evidence.

1. *Theresa Parker's testimony.*[2] The defendant moved into Theresa's apartment in July of 1982. At that time, Theresa, who had separated from her husband in 1981, had three daughters, the youngest of whom, Tanya, had been born in 1980. On the morning of December 21, 1982, before noon, after her daughter Angela had gone to day care by bus, Theresa took her daughter Jamie to school, leaving Tanya in the living room watching television.[3] The defendant was lying on a couch in the living room. Tanya cried and begged to go with her mother. Theresa

new trial was affirmed on appeal, and further appellate review was denied. See *Commonwealth* v. *Proulx*, 34 Mass. App. Ct. 1107 (1993).

[2]Theresa was indicted for murder in the second degree for the death of Tanya. She testified against the defendant pursuant to a plea agreement and the charge was reduced to manslaughter. She received a one-year sentence in the house of correction, credited with time served at the Massachusetts Correctional Institution for Women at Framingham.

[3]Jamie, age seven at the time of trial, testified that the last time she saw Tanya she was "in the parlor with [the defendant] and in her yellow pajamas playing on the floor."

returned in ten minutes. When she returned, she saw the defendant in the bathroom, and he called to her to "come here, quick." He was holding Tanya in the bathroom sink, unclothed and unconscious, running cold water on her. When Theresa asked what had happened, the defendant told her, "I don't know what happened to her. . . . I was playing with her [by tossing her over my head] and her eyes rolled back in her head and she went limp." Theresa tried to revive Tanya by slapping the bottoms of her feet and shaking her, but Tanya did not respond. Theresa dressed Tanya and rushed her to the nearby Bon Secours Hospital in Methuen.

Theresa told hospital personnel, "I was holding [Tanya] over my head playing with her [when] her eyes rolled up in her head and she went [limp]." She testified that she had repeated the defendant's explanation to the hospital personnel, but substituted herself for the defendant because she did not think it mattered who had been holding Tanya, because she had believed the defendant's explanation, and because she loved him.

Theresa later told the personnel at Massachusetts General Hospital that Tanya had a bruise on her forehead because she had banged her head earlier that week when she fell on a rocking chair.

While awaiting trial, Theresa corresponded with the defendant and asked him what had happened when he was alone with Tanya. She testified that the defendant reported he was lying on the couch and Tanya was playing in the bedroom when he heard a loud bang. He went to the bedroom and found Tanya unconscious. He stated she may have fallen on a toy box.

Theresa also testified that she had taken Tanya to Bon Secours Hospital on October 30, 1982, for an examination after someone reported possible abuse to the police. Theresa told hospital personnel that she had spanked Tanya and that Tanya had been fighting with her sister. She testified that she had untruthfully assumed responsibility for Tanya's cuts and bruises on that occasion because she did not want the defendant to get in trouble.

2. *The medical evidence.* At the time of her arrival at Bon Secours Hospital, Tanya was determined to be clinically dead. Extensive medicinal and mechanical assistance was provided at

Bon Secours Hospital and later at Massachusetts General Hospital, but Tanya's heartbeat and breathing could not be sustained. She was declared dead five days later.

Dr. Nicholas Andronic, a staff physician in the emergency room at Bon Secours Hospital, testified that he saw no causal relationship between Tanya's condition and Theresa's explanation that she had been playing with Tanya, tossing her overhead, when she suddenly went limp.

Dr. Kenneth Davis, director of neuroradiology at Massachusetts General Hospital, observed Tanya's head injuries on a CAT scan. He noted a skull fracture almost two inches long in the back, right side of her skull; an extended acute subdural hematoma (collection of blood); brain swelling (edema); and an older, healing rib fracture. He testified that the hematoma had been sustained within minutes or hours of Tanya's arrival at the emergency room, but in any event within the previous thirty-six hours. He opined that it was "highly improbable" that Tanya's injuries could have resulted from falling off of a rocking chair and that it was "unlikely" that an injury from falling off of a bed onto a toy box would be severe enough to produce the injuries he observed.[4] He also stated that the injuries were not consistent with being "held over head."[5] When asked whether he could exclude beyond all medical certainty that Tanya's injuries could have been caused by falling and hitting her head on a rocking chair, Dr. Davis stated he could not answer the question without knowing the height from which she fell.

Dr. Linda Cooper, the attending physician in the pediatric intensive care unit at Massachusetts General Hospital, observed Tanya during the time that extensive medicinal and mechanical assistance was provided. She stated that it was obvious that Tanya had sustained head trauma and that an electroencephalogram revealed a slowing of brain waves to the point where there was no brain activity. She opined that Tanya's injuries were not consistent with her falling and hitting her head on a rocking chair, and not consistent with a child being held over a

---

[4]In an effort to explain an injury to Tanya's forehead, Theresa had told the emergency room personnel that Tanya had fallen on a rocking chair a few days earlier.

[5]Theresa's explanation often was presented in this shortened fashion.

person's head and that child having her eyes roll back and going limp. When asked whether Tanya's injuries were consistent with her falling off of a bed and striking her head on a toy box, Dr. Cooper said it was hard to give a yes or no answer and made no additional comment. She was not asked any additional questions.

Dr. Leonard Atkins, Suffolk County assistant medical examiner, performed an autopsy on Tanya. He concluded that the cause of Tanya's death was a three-inch "[s]kull fracture with acute subdural hematoma and cerebral edema" located in the right side of the occipital bone. Dr. Atkins also observed a three-inch by two-inch subcutaneous hemorrhage in that area and another of similar size in the posterior parietal region. There was also a subarachnoid hemorrhage in the right parietal region. The swelling of the brain resulted in an increase from what he termed a normal weight of 1,000 to 1,050 grams for a child the size of Tanya, to 1,555 grams. Dr. Atkins observed a marked flattening of the brain convolutions that had resulted from the swelling. He stated the swelling was a result of traumatic injury. He also observed bruises on the liver corresponding to the overlying ribs, and blood in the mesentery of the small intestine. While he acknowledged that these latter two injuries could have been caused in the hospital, he was not aware of any procedures actually performed that could have resulted in those injuries.

Dr. Atkins also testified that the injuries he observed were not consistent with Tanya being tossed in the air over a person's head without falling, not consistent with a child falling and hitting her head on a rocking chair unless "she fell from the ceiling," and not consistent with a child falling off of a bed and striking a toy box. Dr. Atkins stated that the injuries he observed were more severe than those that would result from those causes. On the basis of his experience, he compared Tanya's injuries to those caused by "[b]eing struck with a baseball bat, or being struck by a two-by-four, or being struck by a motor vehicle, [or] being held by the leg and having the head swung against a wall, [or] being hit against a wall with great force."

Dr. Eli Newberger testified generally on battered child syndrome. He also reviewed Tanya's medical records, and

concluded that her death was caused by child abuse. He opined that the skull fracture was substantial and very large for a child of Tanya's age and that such injury could not have been caused by a fall unless from a second-story window. In a detailed overview of all of Tanya's injuries, including older ones, he opined that they did not result from a fall. He noted that the hemorrhage in the mesentery suggested major abdominal trauma, frequently seen in severe cases of child abuse. He stated that he could not exclude beyond all medical certainty that the mesentery hemorrhage and liver bruises had not been caused by hospital procedures, but he believed they were not caused in that way.

3. *The defendant's statements to the police.* The defendant told Massachusetts State Trooper Francis Riley that he had worked all night, had arrived at Theresa's apartment at around 5:00 or 5:30 A.M., and had gone to bed. He slept until about 11:00 A.M., and then he dozed on the living room couch while Theresa brought Jamie to school. He later heard Theresa scream from the bedroom. He jumped up and ran to her. She was hysterical and holding Tanya, who was limp. Theresa told him that she had been playing with Tanya, holding her over her head when Tanya went limp and her eyes rolled back in her head. The defendant slapped Tanya a few times to revive her and pushed on her stomach to try cardiopulmonary resuscitation (CPR). He then told Theresa to take Tanya to the hospital, and he followed soon thereafter.

Massachusetts State Trooper Francis O'Connor testified that the defendant told him that when he woke up that morning, Tanya was running around and looked pretty good, although she had been sick the previous few days. The defendant also told Trooper O'Connor that when Theresa returned from bringing Jamie to school, she had been playing with Tanya in the bedroom. The defendant then heard Theresa scream so he ran into the bedroom and saw Tanya lying on the floor. She was not breathing. Theresa undressed her and placed her in a tub of cold water. The defendant placed Tanya on the bed and attempted CPR by pressing on her stomach.

4. *Other evidence.* Four friends and neighbors of Theresa and the defendant testified that they had seen both Theresa and the

defendant discipline Tanya, but that the defendant hit her harder and more often and that Tanya was afraid of the defendant.[6]

5. *The defense.* The defendant's cross-examination of Theresa focused on her plea agreement, her discipline or possible abuse of Tanya, her previous lies, and inconsistencies in her explanations. The defendant's cross-examination of the friends and neighbors focused on Theresa's discipline or abuse of Tanya. In closing argument, defense counsel primarily emphasized Theresa's credibility and inconsistencies in her statements. He also argued that there was no evidence that the defendant "did anything in this case" and that it was just as likely that Theresa was the perpetrator. Defense counsel pointed out three possibilities for the jury: (1) the death was accidental; (2) the defendant was the perpetrator; or (3) Theresa was the perpetrator. He did not argue that the defendant accidentally injured Tanya or that the defendant engaged in an act which rose only to the level of manslaughter, although he did argue that the Commonwealth had not shown that the killing was intentional or malicious.

B. *Discussion.* The Commonwealth agrees, as it must, that the portion of the jury instruction that permitted a finding of malice on evidence that the defendant committed an act creating a plain and strong likelihood of death "or grievous bodily harm" was error. See *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 395-396 (1998), *S.C.*, 431 Mass. 360 (2000); *Commonwealth* v. *Azar*, 435 Mass. 675, 681-683 (2002). A proper instruction permits a jury to infer malice only "if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987). The Commonwealth argues that the motion judge should not have granted the defendant's motion for new trial because the defendant waived review of this issue, or because the error did not create a substantial risk of a miscarriage of justice. We agree that the error did not create a substantial risk of a miscarriage of justice.

---

[6] "There was abundant evidence from independent sources (babysitters) that the defendant often struck Tanya with hard blows, either for no reason or for discipline." *Commonwealth* v. *Proulx*, 23 Mass. App. Ct. at 987.

1. *Waiver.* There is no question that the defendant did not object at trial and did not raise this issue until his third motion for new trial. "As such, the error was waived, and we review the defendant's motion for a new trial — whether based on the error itself or framed as a claim of ineffective assistance of counsel — solely to determine whether the error gives rise to a substantial risk of a miscarriage of justice." *Commonwealth* v. *Russell,* 439 Mass. 340, 345 (2003). See *Commonwealth* v. *Miranda,* 22 Mass. App. Ct. 10, 16 (1986).[7]

2. *Substantial risk of a miscarriage of justice.* The motion judge did not preside at trial, thus we "regard ourselves in as good a position as the motion judge to assess the trial record." *Commonwealth* v. *Grace,* 397 Mass. 303, 307 (1986). In addition, he did not assess the credibility of any witnesses at the hearing on the new trial motion. As such, the motion judge was in no better position to determine whether there is a substantial risk of a miscarriage of justice. *Azar,* 435 Mass. at 687 n.9. "That determination requires no fact-finding, and, indeed, it is a determination that appellate courts make frequently." *Ibid.*

"The substantial risk standard requires us to determine 'if we have a serious doubt whether the result of the trial might have been different had the error not been made.' *Commonwealth* v. *LeFave,* 430 Mass. 169, 174 (1999). We review the evidence and the case as a whole." *Azar, supra* at 687. In making that determination, we ask four questions: "(1) whether there was error, (2) whether the defendant was prejudiced by the error, (3) '[c]onsidering the error in the context of the entire trial,' whether it would be 'reasonable to conclude that the error materially influenced the verdict,' and (4) whether we may infer from the record that counsel's failure to object was not a reasonable tactical decision." *Commonwealth* v. *Russell,* 439 Mass. at 345, quoting from *Commonwealth* v. *Randolph,* 438 Mass. 290, 298 (2002).

---

[7] We disagree with the Commonwealth's argument that the defendant should be foreclosed from raising the claim of third prong malice error at this far remove from the trial. We are not aware of any precedent that forecloses our review in the circumstances of this case. *Commonwealth* v. *Young,* 56 Mass. App. Ct. 60, 62 (2002). Compare *id.* at 63 & n.4, and cases there collected; *Commonwealth* v. *Vizcarrondo,* 427 Mass. at 396 n.5; *Commonwealth* v. *Azar,* 435 Mass. at 684 n.5.

Three of these questions are easily resolved in favor of the defendant. There was error in the jury instruction, the error was unfavorable to the defendant, and there appears to be no tactical or strategic reason for defense counsel's failure to object. See *Azar, supra* at 689 ("there is no reasonable tactical basis for a failure to object to a mistaken and unfavorable [to the defendant] definition of an element of the crime"). The final question requires us to determine whether in the context of the entire trial the error "created a risk that the jury would find the presence of malice, and therefore a risk that they would find murder, on mere proof of a plain and strong likelihood of grievous bodily harm." *Id.* at 687.

The Commonwealth argues that the defendant did not contest the element of malice, but rather focused on a defense of identity. The Commonwealth also argues that in the context of the entire trial, the error did not create a substantial risk of miscarriage of justice because the evidence was such that a jury could find nothing less than a plain and strong likelihood of death.[8]

The defendant argues that his theory of defense encompassed an accident defense, placing the third prong of malice squarely in contention. The defendant also argues that the medical evidence was conflicting such that a jury could have convicted him on mere proof of an act that created a plain and strong likelihood of grievous bodily harm. We conclude that Tanya's injuries were such that a jury could find nothing less than a plain and strong likelihood of death and that the only live issue at trial was the identity of the perpetrator.

Even after examining the record in the light most favorable to the defendant, we conclude that identity of the perpetrator was the main issue at trial. The defendant did not pursue an ac-

---

[8]The judge instructed the jury on murder in the second degree and manslaughter, repeatedly distinguishing murder as requiring a finding of malice. In his instruction on third prong malice, he stated that proof is required that the defendant "intended to do an act creating a plain and strong likelihood that death or grievous bodily harm would follow." Following his instruction on manslaughter, he repeated this definition of third prong malice. In answering a jury question, "Is the word intent and malice one and the same?" in the course of defining intent and malice, the judge again added the erroneous language "or grievous harm."

cident defense in the sense that he did not claim that he accidentally injured Tanya.[9] He did raise, however, a defense that Tanya injured herself accidentally. This defense, when viewed in the context of the entire trial, was not sufficient to support a claim that the element of malice was in dispute. Any error in the third prong of malice instruction did not, therefore, create a substantial risk of a miscarriage of justice.

As we have noted, the primary theory of defense was that Theresa was the perpetrator and had lied about her return to the apartment to find Tanya unconscious. The alternative theory propounded by the defense suggested that Tanya had injured herself accidentally. Other than a lone reference in the medical records, there was no evidence that could be interpreted to suggest that the defendant was claiming that he accidentally injured Tanya. The defendant did not admit to touching Tanya in a way that could cause grievous bodily harm. Contrast *Commonwealth* v. *Vizcarrondo*, 427 Mass. at 394 (defendant told police that he squeezed baby, she fell off of bed, and he tripped, causing them both to fall); *Azar*, 435 Mass. at 678 (defendant explained that baby's injuries occurred when she flew out of his arms and hit her head on kitchen counter top). Moreover, all of the expert witnesses testified that Tanya's injury was not consistent with being held overhead. Therefore, even if the defendant's statement, as referred to in the medical records, was interpreted as a claim that he had accidentally injured Tanya, the error in the jury instruction did not create a substantial risk of a miscarriage of justice.

The defendant also argues that the fact that the jury asked a

---

[9]The motion judge based his conclusion that the error created a substantial risk of a miscarriage of justice in part on a statement contained in medical records, attributed to the defendant, that he had been holding the child above his head when she went limp and her eyes rolled back in her head. The judge also stated that the circumstances of Tanya's death "cannot be known with certainty and defendant's conduct cannot be deemed to be inherently deadly." We are aware of no case that precludes a conviction on third prong malice based on circumstantial evidence. In stating that identity of the perpetrator was not the only live issue at trial, the judge referred to defense counsel suggesting once that the Commonwealth had not proved that the injuries were inflicted intentionally or maliciously, and seems to have relied on a nonanswer of Dr. Davis to infer that Tanya's head injury could have been caused by hitting her head on a rocking chair.

question about the distinction between intent and malice, indicating that they were focused on the subject, and the fact that the erroneous language was repeated in the answer to the question also support his claim that the instruction created a substantial risk of a miscarriage of justice. Again, the case was not tried on the theory now advanced on appeal; thus any error, even if it was repeated, did not create a substantial risk of a miscarriage of justice. "[W]hether a particular element of a crime was contested at trial is important to a determination whether a trial error resulted in a substantial risk of a miscarriage of justice. We have held previously that no harm accrues to a defendant if an error [in instruction] does not relate to an issue actively contested at trial." *Commonwealth* v. *Gabbidon,* 398 Mass. 1, 5 (1986). Compare *Commonwealth* v. *Richardson,* 425 Mass. 765, 768 (1997); *Commonwealth* v. *Gagnon,* 430 Mass. 348, 350 (1999).

We disagree with the defendant's claim that it was not "necessary" or "ineluctable" that whatever force was used that caused the child's death created a plain and strong likelihood of death. In support of this argument, the defendant attempts to characterize the injuries to Tanya as less severe than the injuries to the baby in *Azar, supra* at 678. This characterization is not persuasive. The injuries to Tanya's head were substantial, leading rapidly to unconsciousness and death. The medical witnesses testified that the injuries were consistent with a blow by a baseball bat, being struck by a motor vehicle, swinging Tanya by the heels and into a wall, or hitting her head into a wall. One of the experts testified that a skull fracture of this sort would not occur from a fall unless the fall was from a second-story window.

We also think that a reasonably prudent person knows that inflicting such a force as would fracture the skull of a two year old child and cause brain damage poses a plain and strong likelihood that the child will die, not merely a likelihood of grievous bodily harm. Compare *Avellar* v. *DuBois,* 30 F. Supp. 2d 76, 99 (D. Mass. 1998) (nothing less than plain and strong likelihood of death where massive skull fracture shattered skull and principal issue was identity of assailant, not malice); *Commonwealth* v. *Russell,* 439 Mass. at 346 (reasonably prudent

person knows that deliberately driving over pedestrian with car poses plain and strong likelihood of death, not merely likelihood of injury).

We do not agree with the defendant that, as in *Azar, supra* at 688-689, the medical evidence was conflicting regarding the amount of force necessary to cause Tanya's injuries. According to the defendant, the medical evidence made "possible" the opinion that Tanya's head injury could have occurred from a fall on a toy box or onto a rocking chair. The defendant bases this argument on two answers given by two of the doctors during cross-examination.

The defendant's first example of conflicting medical evidence is the reply of Dr. Davis to the question whether he could exclude beyond all medical certainty that the injuries could have been caused by Tanya falling and striking her head on a rocking chair. Dr. Davis stated that he could not answer that question without knowing the height from which the child fell. This reply does not support the defendant's argument that the medical evidence was conflicting because Tanya's alleged fall on to the rocking chair was never offered as an explanation for the injuries sustained to the back of Tanya's head. Rather, it was an explanation given by Theresa to hospital personnel to explain a bruise on Tanya's forehead. Thus, Dr. Davis's reply had no bearing on any possible theory of the defense. In any event, there was no answer given, and it is fundamental that the question cannot be considered evidence and no inferences may be drawn from it. See *Commonwealth* v. *Lee*, 4 Mass. App. Ct. 453, 456 (1976) ("questions are not evidence and . . . unless questions were answered, they should not be a factor in the jury's consideration"). See also *Commonwealth* v. *Ploude*, 44 Mass. App. Ct. 137, 142 (1998).

The defendant's second example of conflicting medical evidence is Dr. Cooper's reply to the question whether the injuries were consistent with a child falling off of a bed and striking her head on a toy box. Dr. Cooper replied that it would be difficult to give a yes or no answer to that question. This reply, which was not pursued at trial, does not provide the kind of conflicting medical evidence that creates a substantial risk of a miscarriage of justice, such as that in *Azar*, 435 Mass. at 688-

689.[10] Furthermore, the answer has no relationship to the third prong of malice because nothing in that explanation suggested that the defendant was involved in Tanya's alleged fall from the bed onto a toy box.

C. *Conclusion.* In the circumstances of this case, where there was no claim that the defendant accidentally injured Tanya and the evidence was overwhelming that the injuries could only have been caused by an act creating a plain and strong likelihood of death, the error in the third prong of malice instruction did not create a substantial risk of a miscarriage of justice. *Commonwealth* v. *Russell,* 439 Mass. at 345-346 & n.7.

Although there was no direct evidence of the manner in which the "fatal blow," *Commonwealth* v. *Proulx,* 23 Mass. App. Ct. at 987, occurred, we need not know precisely the manner in which the fatal injury was inflicted when the force that caused the injury may be inferred from the medical evidence. Compare *Commonwealth* v. *Starling,* 382 Mass. 423, 426 (1981) ("From the medical examiner's testimony the jury could infer that someone struck the baby a very severe blow . . . causing her death").

We have considered the defendant's assertions that it is possible that a jury could examine the evidence and conclude that the defendant did something to Tanya that created only a risk of grievous bodily injury. "A mere possibility of a different outcome will not satisfy [the burden to show there is a substantial risk that the outcome of the trial would have been different]. . . . [T]he formula asks if there is a *substantial* risk of a miscarriage of justice." *Commonwealth* v. *Amirault,* 424 Mass. 618, 652 (1997). Under these circumstances, there is no serious concern that the result might have been different if the

---

[10]In *Azar, supra* at 679-680, the defendant presented two of his own medical experts. Both doctors testified that the baby's injury could have occurred in the manner described by the defendant. *Ibid.* In addition, the defendant's experts contradicted the Commonwealth's experts on important facets of the medical evidence. *Ibid.* For example, one of the defendant's experts testified that the child's skull fracture was caused by only a moderate amount of trauma. *Id.* at 679. The second expert disputed the conclusion of the Commonwealth's experts that the child had suffered swelling of the brain. *Id.* at 680. He stated that there was no or slight evidence of swelling, and provided alternative reasons for such slight swelling if it did exist. *Ibid.*

error had not been made. *Commonwealth* v. *LeFave*, 430 Mass. at 174-175; *Commonwealth* v. *Amirault, supra* at 646-647.[11]

> *Order allowing defendant's motion for new trial reversed.*

---

[11]As we have concluded that the erroneous jury instruction did not create a substantial risk of a miscarriage of justice, we need not consider whether counsel was ineffective for failing to object. "Our view is that if an omission of counsel does not present a substantial risk of a miscarriage of justice . . . there is no basis for an ineffective assistance of counsel claim under either the Federal or the State Constitution." *Commonwealth* v. *Curtis*, 417 Mass. 619, 624 n.4 (1994). See *Azar*, 435 Mass. at 686, and cases cited.