After a jury trial in 1990, the defendant was convicted of murder in the second degree for killing his girl friend, Leisha "Lee" Sanford. He comes before this court for a fourth time, arguing that he is entitled to a new trial because the trial judge's instructions to the jury on the third prong of malice were erroneous and because counsel was ineffective. The motion judge denied the motion. Although we agree that the instructions were erroneous, we affirm nonetheless because we are persuaded that the error did not create a substantial risk of a miscarriage of justice, nor was counsel ineffective. We also affirm the judge's implicit denial of the defendant's motion to reduce the verdict to involuntary manslaughter.
Procedural history. The events leading to the victim's death in 1989 were recited in our 1995 decision affirming the defendant's conviction on direct appeal. See Commonwealth v. Estep, 38 Mass. App. Ct. 502, 503-504 (1995). In that appeal, among other arguments, the defendant contended that the trial judge, in jury instructions defining third prong malice, improperly included language referring to "grievous bodily harm." Id. at 507-508. The instructions are recited below, with emphasis added to highlight the language at issue.
At the beginning of his charge, the judge told the jury, "[m]alice may be proven by evidence of any unexcused intent ... to do an act creating a plain and strong likelihood that either death or grievous harm will follow." Shortly thereafter, the judge gave a slightly different instruction, informing the jury that they could infer malice "where a reasonable person under the circumstances known to the defendant would have known that, according to common human experience, ... there was a probability of causing grievous bodily harm and a plain likelihood of death as a result of the defendant's act." He repeated the substance of the latter definition once more during that charge, but this time referred to a "plain and strong likelihood" of death.
The following day,[2] after the jury requested "a clarification of first degree murder, second degree murder and manslaughter," the judge instructed the jury several more times on third prong malice, again giving inconsistent definitions. First, he stated that malice is the intent "to do an act creating a plain and strong likelihood that either death or grievous bodily harm would follow." However, he then indicated that malice "may be inferred where a reasonably prudent person in the circumstances known to the defendant would have known that according to common experience there was a probability of causing grievous bodily harm and a plain likelihood of death." Finally, he instructed the jury that malice requires conduct toward another "which will probably do grievous bodily harm to that other or will create a plain and strong likelihood [of death]."
The portions of the instructions which contained the disjunctive "or," if followed, would have allowed the jury to return a verdict of guilty of murder in the second degree upon proof that the defendant's conduct created a probability of causing only grievous bodily harm. As we will discuss in detail infra, these portions of the instructions incorrectly stated the law. On direct appeal, the defendant argued that these erroneous instructions, to which his counsel did not object at trial, created a substantial risk of a miscarriage of justice. This court rejected that argument at the time, reasoning that the instructions given "were in accord with Commonwealth v. Delaney, 418 Mass. 658, 666 (1994), and Commonwealth v. Sama, 411 Mass. 293, 298 (1991)." Estep, 38 Mass. App. Ct. at 508. Further appellate review was denied. Commonwealth v. Estep, 420 Mass. 1105 (1995).[3]
After the defendant's direct appeal, the Supreme Judicial Court decided Commonwealth v. Vizcarrondo, 427 Mass. 392 (1998), S.C., 431 Mass. 360 (2000), and Commonwealth v. Azar, 435 Mass. 675 (2002), S.C., 444 Mass. 72 (2005). In both cases, the court set aside guilty verdicts based on erroneous jury instructions on third prong malice. In so doing, the court made it clear that including "or grievous bodily harm" in a third prong malice instruction "improperly permitted the jurors to infer malice on proof that the defendant committed an act that he knew (or should have known) would result in grievous bodily harm," when what is required instead is "a plain and strong likelihood of death." Vizcarrondo, 427 Mass. at 395. See Azar, 435 Mass. at 682. The court acknowledged that some of its earlier opinions had incorrectly included such language, which potentially "misled" trial judges and caused "confusion." Azar, 435 Mass. at 684 n.5. See Vizcarrondo, 427 Mass. at 396 n.5. Nonetheless, the court reiterated that the instructions in Azar, which was tried in 1989 and contained precisely the same error as that at issue in this case, "were erroneous when given." Azar, 435 Mass. at 684 n.5. In addition, the court in Commonwealth v. Sires, 413 Mass. 292 (1992) -decided prior to the defendant's direct appeal-had "reject[ed] any suggestion that ... something less than a plain and strong likelihood of death [is] sufficient for proof of the third prong of malice." Id. at 303 n.14.
In both Vizcarrondo and Azar, the court concluded that the error, in light of trial evidence that permitted, but did not compel, a finding of a plain and strong likelihood of death, created a substantial risk of a miscarriage of justice and warranted a new trial. See Vizcarrondo, 427 Mass. at 397-398 ; Azar, 435 Mass. at 687-690. The Azar opinion cited several more cases involving the same erroneous instruction, each requiring reversal and a new trial. See, e.g., Commonwealth v. Williams, 428 Mass. 383, 385, 387-388 (1998) (substantial risk of miscarriage of justice, where "a reasonable jury might have found that the defendant's acts created a plain and strong likelihood of grievous bodily injury, but not a plain and strong likelihood of death"); Commonwealth v. DiRenzo, 44 Mass. App. Ct. 95, 99-101 & n.6 (1997) (prejudicial error); Commonwealth v. Pichardo, 45 Mass. App. Ct. 296, 299-301 (1998) (substantial risk of miscarriage of justice). In the case before us now, on the defendant's third motion for a new trial, the defendant argues that these decisions require that same conclusion here.
Discussion. 1. Direct estoppel. As a threshold matter, the Commonwealth asserts that the defendant's claim is barred by the doctrine of direct estoppel, as the argument was raised and rejected in his direct appeal.[4] See Commonwealth v. Rodriguez, 443 Mass. 707, 710-711 (2005) (where issue was actually litigated and decided on direct appeal, and was essential to decision, direct estoppel barred relitigation of issue through motion for new trial). This is a fair argument. However, upon consideration, we are persuaded that we should address the issue even now, given the unusual appellate history of this case and other cases raising this same issue, combined with the fact that this court, in the direct appeal, did not have an opportunity to review all of the trial transcript, including the portion with the supplementary jury instructions at issue here.
Specifically, although this court upheld the challenged instruction in this case in 1995, and further appellate review was denied, the Supreme Judicial Court later stated, in Azar, that, despite the fact that "some opinions of [that] court ... incorrectly included grievous bodily harm language in the description of the third prong of malice," "the instructions were erroneous when given." Azar, 435 Mass. at 684 n.5. See Vizcarrondo, 427 Mass. at 395-396 & n.5. Furthermore, this court's opinion in Commonwealth v. Azar, 50 Mass. App. Ct. 767 (2001), with which the Supreme Judicial Court agreed on further appellate review, specifically cited this defendant's case among others where this erroneous instruction had been given. Id. at 770, citing Estep, 38 Mass. App. Ct. at 507-508. The Vizcarrondo court also identified Delaney, 418 Mass. at 666-667, upon which this court relied in affirming the defendant's conviction on direct appeal, see Estep, 38 Mass. App. Ct. at 508, as a case involving the offending language. See Vizcarrondo, 427 Mass. at 395 n.5. The other case this court relied upon in affirming the conviction, Sama, 411 Mass. at 298, see Estep, 38 Mass. App. Ct. at 508, was recognized as erroneous in DiRenzo, 44 Mass. App. Ct. at 99-100 & n.7. See Avellar v. Dubois, 30 F. Supp. 2d 76, 79 (D. Mass. 1998).
"[R]elitigation of [an] issue in a subsequent action between the parties is not precluded [when] ... (2) ... (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws." Restatement (Second) of Judgments § 28 (1982) ( section 28 ). This "intervening change in the applicable legal context" exception to the rule of issue preclusion applies in both the direct estoppel and collateral estoppel settings.[5] An attempt to relitigate an issue previously resolved on direct appeal raises a question of direct, rather than collateral, estoppel. See Rodriguez, 443 Mass. at 709-711.
Although neither the Supreme Judicial Court nor this court has yet adopted this exception, the court cited it with apparent approval in Commonwealth v. Williams, 431 Mass. 71 (2000), referring to "the discretionary exception that permits a reviewing court to authorize re-litigation of an issue because of an intervening change in the applicable law. See Restatement (Second) of Judgments § 28(2) & Reporter's Note at 286 (1982)." Id. at 76. Also, in Rodriguez, without citing section 28(2), the court assumed without deciding that, notwithstanding the principle of direct estoppel, an issue decided against a defendant on direct appeal could be relitigated through a motion for a new trial, if, in the interim, the court had determined that the issue had been wrongly decided in the direct appeal. Rodriguez, 443 Mass. at 711. And in Fidler v. E.M. Parker Co., 394 Mass. 534 (1985), the court recognized section 28(2)'s "change in the applicable legal context" exception, but found it inapplicable. See id. at 544.
Finally, albeit without citing section 28(2), the court rejected a direct estoppel argument, based at least in part on a change in legal context, in Commonwealth v. Bolden, 470 Mass. 274 (2014). There, Bolden's convictions of three counts of aggravated burglary had been affirmed by this court on direct appeal, rejecting his contention that two of his convictions were duplicative. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 275, 280 n.4, citing Commonwealth v. Bolden, 42 Mass. App. Ct. 1105 (1997). While his application for further appellate review was pending, this court decided Commonwealth v. Gordon, 42 Mass. App. Ct. 601 (1997), which "thoroughly analyzed" a similar claim of duplicative aggravated burglary convictions and agreed that the convictions were duplicative. See Bolden, 470 Mass. at 277-278, 280 n.4. The Supreme Judicial Court denied further review in Bolden's direct appeal. 425 Mass. 1103 (1997). See Bolden, 470 Mass. at 277. Bolden then moved for postconviction relief; the trial court denied the motion, and this court affirmed. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 277, citing Commonwealth v. Bolden, 84 Mass. App. Ct. 1106 (2013). On further appellate review of that decision, see Bolden, 470 Mass. at 277, the Commonwealth argued that Bolden's duplicative-conviction argument was barred by direct estoppel. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 280 n.4. However, the Supreme Judicial Court rejected that argument, stating that Bolden "was entitled to the benefit of the decision in Commonwealth v. Gordon...." Ibid. The court went on to vacate one of Bolden's convictions as duplicative and ordered the underlying indictment dismissed. Id. at 280-281. In short, in a procedural position parallel to that in this case, despite the fact that the issue was resolved adversely to Bolden on direct appeal to this court, and despite the fact that further appellate review was denied, Bolden was entitled to raise the issue in a motion for postconviction relief, and direct estoppel did not bar him from benefiting from a decision, albeit one issued after we affirmed his conviction, that changed the legal context in his favor.[6]
In light of these decisions suggesting that section 28(2)'s "change in the applicable legal context" exception would apply in an appropriate case, and because section 28's other exceptions[7] have been cited with approval in both criminal and civil cases,[8] we conclude that the section 28(2) exception applies here. That is, given this case's extraordinary appellate history-the fact that, after the defendant's direct appeal, Vizcarrondo and Azar made it clear that the third prong malice instruction given at trial was erroneous, and both of the decisions (Delaney and Sama ) upon which this court relied in the defendant's direct appeal when upholding the third prong of malice instruction were determined to have decided the issue erroneously, see supra-we are persuaded that the legal context has changed so significantly that direct estoppel should not apply. We therefore consider whether the erroneous instruction created a substantial risk of a miscarriage of justice warranting a new trial.
2. Substantial risk of a miscarriage of justice. "The substantial risk standard requires us to determine 'if we have a serious doubt whether the result of the trial might have been different had the error not been made.' " Azar, 435 Mass. at 687, quoting from Commonwealth v. LeFave, 430 Mass. 169, 174 (1999). As the Supreme Judicial Court said in another case involving an erroneous third prong malice instruction, "we consider four questions: (1) whether there was error, (2) whether the defendant was prejudiced by the error, (3) '[c]onsidering the error in the context of the entire trial,' whether it would be 'reasonable to conclude that the error materially influenced the verdict,' and (4) whether we may infer from the record that counsel's failure to object was not a reasonable tactical decision." Commonwealth v. Russell, 439 Mass. 340, 345 (2003), quoting from Commonwealth v. Randolph, 438 Mass. 290, 298 (2002). Here, we assume the first, second, and fourth questions to be answered in the defendant's favor, and so we focus on whether it would be reasonable to conclude that the error materially influenced the verdict. See Russell, 439 Mass. at 345. That question must be analyzed considering the error in the context of the entire trial, with reference to the evidence and the case as a whole. Ibid. "A new trial will be ordered only in the extraordinary situation where, after such a review, we are left with uncertainty that the defendant's guilt has been fairly adjudicated." Azar, 435 Mass. at 687, quoting from Commonwealth v. Chase, 433 Mass. 293, 299 (2001).
a. Analysis of effect of erroneous instructions on malice. Many cases involving erroneous third prong malice instructions have approached the question of the error's influence on the verdict by examining whether the evidence, viewed in the light most favorable to the defendant,[9] "required the jury, at a minimum, to find that 'in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience,' 'a plain and strong likelihood of death would follow the defendant's actions.' " Commonwealth v. Gilbert, 447 Mass. 161, 173-174 (2006) (footnote omitted), quoting from Azar, 435 Mass. at 682, 689. See Commonwealth v. Childs, 445 Mass. 529, 534 (2005). Put differently, "a new trial is unnecessary where the presence of malice, as it is correctly understood, can be 'ineluctably inferred' from the evidence." Azar, 435 Mass. at 688, quoting from Vizcarrondo, 427 Mass. at 397.
This is not, however, the only approach to the question. As demonstrated by Commonwealth v. Proulx, 61 Mass. App. Ct. 454 (2004), if the main issue at trial was not whether the defendant acted with third prong malice, but instead whether it was the defendant or someone else who caused the fatal injuries, then we may doubt whether the erroneous instruction materially influenced the verdict. See id. at 462-464. "[W]hether a particular element of a crime was contested at trial is important to a determination whether a trial error resulted in a substantial risk of a miscarriage of justice. We have held previously that no harm accrues to a defendant if an error [in instruction] does not relate to an issue actively contested at trial." Id. at 464, quoting from Commonwealth v. Gabbidon, 398 Mass. 1, 5 (1986).
In Gabbidon, where the only live issue at trial was the identity of the perpetrator, an erroneous instruction on specific intent to kill was held not to create a substantial risk of a miscarriage of justice. 398 Mass. at 5. The Supreme Judicial Court has repeatedly applied this principle in the context of erroneous instructions on malice, where the main or only issue at trial was the identity of the perpetrator. See Commonwealth v. Puleio, 394 Mass. 101, 109 (1985) ; Commonwealth v. Bembury, 406 Mass. 552, 562-563 (1990) ; Commonwealth v. Avellar, 416 Mass. 409, 421-422 (1993) ; Commonwealth v. Richardson, 425 Mass. 765, 768 (1997) ; Commonwealth v. Gagnon, 430 Mass. 348, 350 (1999).
We think this principle applies here.[10] In this case, as in Proulx, "[e]ven after examining the record in the light most favorable to the defendant, we conclude that identity of the perpetrator was the main issue at trial." Proulx, 61 Mass. App. Ct. at 462. "This defense, when viewed in the context of the entire trial, was not sufficient to support a claim that the element of malice was in dispute. Any error in the third prong of malice instruction did not, therefore, create a substantial risk of a miscarriage of justice." Id. at 463. We add that we would reach the same conclusion even if, unlike in Proulx, we were to view the evidence in the light most favorable to the Commonwealth, which presented the defendant as having attacked the victim far more severely than in the defendant's version. The theory of the defense was the same, regardless of the lens through which the evidence is viewed in retrospect.
b. The evidence in the light most favorable to the defendant. The victim, twenty-eight years old, died of multiple blunt impact injuries to the head and neck. She was killed in the apartment she shared with the defendant, sometime in the early morning hours of November 10, 1989, after they hosted a party attended by neighbors and their guests, at which considerable alcohol was consumed. The principal theory of the defense was that the victim's injuries were not inflicted by the defendant, and could have been inflicted by Milton Tripp, the victim's former boy friend and the father of some of her children.[11]
The defendant's first witness, Edward Caine, testified that, on the evening of the party, a man he later identified as Tripp had approached him at a liquor store near the apartment, asked him for money, swore at him, and pushed him. The defendant testified that he, too, had seen Tripp outside a nearby liquor store shortly before the party; Tripp came over to the car in which the defendant and the victim were parked and spoke to the victim through the window. Tripp did not attend the party.
The defendant testified that at the party, the victim had made a lewd remark to a guest. When the guests left at about 12:30 a.m., both the defendant and the victim were drunk; he confronted her in the kitchen, asked why she had made the remark, and then slapped her two or three times while she was seated on a chair. After she kicked him and stood up, he shoved her against a wall, and threw her to the floor. Although testimony from the Commonwealth's witnesses indicated that the defendant had attacked the victim using a closed fist, an axe handle, and an electric cord or other neck ligature, the defendant denied having done so.
The defendant testified that he saw no blood on the victim, although she was "a little red." He saw her walk from the kitchen to her bedroom under her own power and lie down on her bed in a normal position. The defendant then fell asleep on the parlor couch at about 1 a.m.
The defense witness Caine testified that he spent the night in the apartment across the hall from the one occupied by the victim and the defendant. At about 5 a.m. the next morning, he heard the noise of a door slamming across the hall, opened the door of the apartment where he was staying, and saw Tripp going down the stairs.
The defendant testified that when he awoke the next morning, a small light in the victim's bedroom, which had been on when he went to sleep, was now off. He called out to her but received no response. He went into the bedroom and discovered the victim with her legs hanging off the bed. He saw blood on her lip; he spoke to her but she did not respond; he did not realize she was dead. He spoke to a neighbor and an ambulance was called. When police and medical personnel responded to the scene at about 8:20 a.m., the victim was observed to have bruises around her eyes, face, neck, arms, hand, and thighs, and dried blood around her nose and mouth.
Human blood stains were found in the kitchen (on a cabinet), and either a cabinet door or a wall; the hallway floor; and in the bedroom (on a comforter underneath the victim, a pillow case, two different walls, and a rug under the bed). Blood was also found on one of the victim's toes. No blood was found on the clothing the defendant was wearing at the time of the incident. The blood stains were not tested to determine their age or whether they matched the blood of the victim, the defendant, or someone else.
The most severe injuries observed at the autopsy were six separate bruises on the victim's scalp, with blood pooling between the scalp and the top of the brain, indicating forceful blows to the head. Also, inside the neck there was bruising and hemorrhaging, indicating that force had been applied to the neck area close to the time of death. There were multiple abrasions and bruises on the front portion of the neck, and pinpoint hemorrhages in the small vessels of the victim's left eye, known as petechiae, which indicated trauma "about the neck or going partially around the neck."
Based on this evidence, the principal theme of defense counsel's closing argument was that Tripp, the former boy friend, could have been responsible for the beating that caused the victim's death. Tripp had been seen in the neighborhood earlier, "looking for a fight with anybody," and had been seen walking down the stairs from the victim's apartment early on the morning she died. Counsel acknowledged the defendant's admission that he had thrown the victim against a wall, but repeatedly stressed that if the defendant had beaten the victim severely enough to cause her death, there would have been blood on his clothes, yet there was none. Nor did it make sense that the defendant, if he had killed the victim, would have waited around until the next morning and called out to her to wake her up. The defendant was drunk and asleep, he argued, and so did not hear the fatal attack on the victim. Counsel further argued, with limited support from the testimony of Caine, that the prosecutor had unsuccessfully attempted to get Caine to change his account of the events, but that Caine's testimony as the jury heard it should be believed.
In sum, counsel urged the jury to find reasonable doubt, based on questions such as, "Did Milton Tripp do it? ... If [the defendant] beat her up, where's the blood on him?" Although counsel touched on other themes as well,[12] nowhere did he suggest that the killer's conduct at most created some likelihood of bodily harm rather than a plain and strong likelihood of death. He did not argue that the killer acted without third prong malice and thus, at most, had committed manslaughter. Instead, his argument was that the defendant was not the killer.
Because the theory of the defense had nothing to do with distinctions between various levels of criminal intent, the erroneous third prong malice instruction created no substantial risk of a miscarriage of justice. Compare Puleio, 394 Mass. at 109 ; Bembury, 406 Mass. at 562-563 ; Avellar, 416 Mass. at 421-422 ; Richardson, 425 Mass. at 768 ; Gagnon, 430 Mass. at 350. That is, we have no "serious doubt whether the result of the trial might have been different had the error not been made."[13] Azar, 435 Mass. at 687, quoting from LeFave, 430 Mass. at 174. Given that conclusion, unlike the court in Proulx, we see no need to go further to decide whether the evidence, viewed in the light most favorable to the defendant,[14] "was such that a jury could find nothing less than a plain and strong likelihood of death." Proulx, 61 Mass. App. Ct. at 462.
3. Ineffective assistance of counsel. The defendant's motion for a new trial also claimed ineffective assistance of both trial and appellate counsel. He asserted that trial counsel's performance was constitutionally defective in choosing not to request a jury instruction on involuntary manslaughter as a death unintentionally caused by a battery. In the same vein, he argued that it was ineffective for appellate counsel to fail to raise that issue on direct appeal. We disagree.
The jury did hear an instruction on involuntary manslaughter under the alternative theory of wanton or reckless conduct. That instruction correctly informed the jury that wanton or reckless conduct is that involving "a high degree of likelihood that substantial harm will result to another." The defendant does not explain why he would have benefited from an instruction informing the jury specifically of involuntary manslaughter resulting from a battery, since the battery at issue was precisely the same conduct that the jury could have found (but apparently did not find) to be wanton or reckless. We see no reason to conclude that the failure to request the instruction on involuntary manslaughter as a battery satisfied the first prong of Commonwealth v. Saferian, 366 Mass. 89, 96-97 (1974).
4. Motion to reduce the verdict. The defendant moved in the alternative to reduce the murder verdict to involuntary manslaughter pursuant to Mass.R.Crim.P. 25(b)(2), as amended, 420 Mass. 1502 (1995). Although the motion judge did not expressly address that issue, we see no abuse of discretion in her implicit denial of the motion.
The power to reduce a verdict is to be used "sparingly," see Commonwealth v. Woodward, 427 Mass. 659, 667 (1998), and we are not persuaded that the verdict in this case is "markedly inconsistent with verdicts returned in similar cases." Commonwealth v. Gaulden, 383 Mass. 543, 556 (1981). See, e.g., Commonwealth v. Hicks, 356 Mass. 442, 444-445 (1969) (upholding murder in second degree conviction where victim was kicked in stomach with such force as to cause death by internal bleeding); Commonwealth v. Tavares, 385 Mass. 140, 157-159 (1982) (reducing verdict from murder in first degree to murder in second degree where victim died of blunt force injuries sustained during spontaneous fight); Gilbert, 447 Mass. at 174-175 (upholding murder in second degree conviction on third prong malice theory where victim died of blunt neck trauma). Considering all of the evidence, we see no error or abuse of discretion in the judge's decision to let the jury's verdict stand.
Order denying motion for new trial affirmed.
Order denying motion to reduce verdict affirmed.

For reasons that are not clear in the record, the transcript of proceedings on that day, September 20, 1990, was not produced until August 29, 2000, when the defendant requested it pro se in preparation for his second motion for a new trial. Thus this court did not have the benefit of that transcript in considering the defendant's direct appeal and therefore could not have evaluated the errors contained therein.

The defendant later filed two motions for a new trial; both were denied, and both denials were affirmed in unpublished decisions pursuant to our rule 1:28. See Commonwealth v. Estep, 46 Mass. App. Ct. 1126 (1999) ; Commonwealth v. Estep, 51 Mass. App. Ct. 1111 (2001). In neither of those motions did the defendant again argue error in the malice portion of the judge's instructions to the jury, nor did he argue ineffective assistance of counsel in relation to that issue.

The Commonwealth also maintains that the instructions considered as a whole were not erroneous. But even if (as was arguably the case here) there are as many correct as incorrect instructions on an issue, the charge as a whole will avoid triggering review for a substantial risk of a miscarriage of justice only if the "correct instructions make it clear to the jury ... that [they] carry more weight than the ... incorrect ones." Commonwealth v. Fickling, 434 Mass. 9, 20 (2001). See Commonwealth v. Lapage, 435 Mass. 480, 484-485 (2001). That did not occur here. Further, even the more nearly "correct" instructions still omitted, in two out of three instances, the requirement that the likelihood of death be not merely "plain" but also "strong." This was not "a steady progression toward a correct and thorough instruction," but instead a "repetitive oscillation between correct and incorrect instructions ...." Commonwealth v. Silva, 455 Mass. 503, 524-525 (2009).

The general rule of issue preclusion is: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27 (1982) ( section 27 ). "Exceptions to this general rule are stated in § 28." Ibid. See ibr.US_Case_Law.Schema.Case_Body:v1">id. § 17(3) & comment c (recognizing that section 27's general rule of issue preclusion is subject to exceptions of section 28 and encompasses both direct and collateral estoppel).

Notably, in Bolden, the legal-context-changing decision in Gordon was issued on May 13, 1997, see 42 Mass. App. Ct. at 601, before the denial of further appellate review in Bolden's direct appeal on May 27, 1997, see 425 Mass. 1103, yet even that denial of further review did not cause direct estoppel to deprive Bolden of the benefit of Gordon. Here, in contrast, the context-changing Vizcarrondo decision was issued in 1998, see 427 Mass. 392, three years after the denial of further appellate review in this defendant's direct appeal. See Commonwealth v. Estep, 420 Mass. 1105 (1995).

Section 28 sets forth a variety of exceptions to the general rule of issue preclusion, including, e.g., where "(1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action"; or where "(4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action."

See Commonwealth v. Bunting, 401 Mass. 687, 691-692 (1988) ( sections 27 and 28 [4] ); Pierce v. Morrison Mahoney, LLP, 452 Mass. 718, 731-732 (2008) (sections 28 and 29 ); York Ford, Inc. v. Building Inspector & Zoning Administrator of Saugus, 38 Mass. App. Ct. 938, 941-942 & n.10 (1995) (section 28 [1], [5] ); Salem v. Massachusetts Commn. Against Discrimination, 44 Mass. App. Ct. 627, 639-640 (1998) ( section 28 [1] ). See also Commonwealth v. Scala, 380 Mass. 500, 506-507 & n.8 (1980) (prior version of section 28 [1] ).

This standard is subject to two qualifications: the court examines only the evidence "that is consistent with the jury's verdict" and also considers medical evidence, e.g., as to the cause of death, if "not challenged on appeal." Commonwealth v. Gilbert, 447 Mass. 161, 174, 175 n.18 (2006).

We thus rely on an alternative ground for affirming the judge's denial of the defendant's motion for a new trial; the judge relied on the approach discussed in Gilbert, 447 Mass. at 173-174, and similar cases.

Tripp had died by the time of trial.

These included that the defendant had limited mental capacity and that certain statements he had made to the police should be disregarded because he did not understand the waiver of Miranda rights he had signed and was mentally incapable of resisting police suggestions or coercion.

Nor do we have such a doubt based on the jury's request here for "a clarification of first degree murder, second degree murder and manslaughter," in response to which they received the same erroneous instruction as before. As the Proulx court said in regard to a similar claim, "[T]he case was not tried on the theory now advanced on appeal; thus any error, even if it was repeated, did not create a substantial risk of a miscarriage of justice." Proulx, 61 Mass. App. Ct. at 464.

Proulx was decided before Gilbert added two qualifications to this standard. See Gilbert, 447 Mass. at 174, 175 n.18. See also note 8, supra.